COMMONWEALTH vs. RONALD G. ANSELMO
(and a companion case[1]).

No. 91-P-487.

Bristol. September 18, 1992. - November 20, 1992.

Present: WARNER, C.J., FINE, & GILLERMAN, JJ.

*Conspiracy. Practice, Criminal,* Trial jury-waived, Speedy trial, Comment
by judge, Grand jury proceeding. *Witness,* Hostile witness. *Evidence,*
Impeachment of credibility, Grand jury proceeding. *Search and
Seizure,* Plain view.

At a jury-waived trial the judge was warranted in making findings of
guilty against two defendants charged with conspiracy to commit lar-
ceny, where the evidence provided a basis for a reasonable inference
that a conspiracy existed, that the defendants knew of the existence and
objectives of the conspiracy, and that they participated in it. [603-608]
At the jury-waived trial of indictments for conspiracy to commit larceny
there was no error in the judge's examining witnesses' prior inconsistent
statements to determine whether the statements were admissible or al-
lowing the prosecutor to question the witnesses about the statements,
which they had recanted at trial. [608-609]
At a jury-waived criminal trial, the judge's comments on the credibility of
two prosecution witnesses who recanted their prior inculpatory state-
ments, followed by his holding one of the witnesses for perjury, did not,
on the record presented, entitle the defendants to allowance of their
motion for a new trial based on the propriety of the judge's comments.
[609-610]
The record of criminal proceedings did not support a defendant's claim
under Mass.R.Crim.P. 36 that he was denied a speedy trial. [610-613]
At the trial of indictments for conspiracy, the admission in evidence of a
statement made by a coconspirator during the furtherance of the con-
spiracy was proper under an exception to the hearsay rule. [613]
There was no merit to a criminal defendant's contention that certain al-
leged irregularities in the grand jury proceeding that led to his indict-
ment required dismissal of the indictment. [613-614]
In a criminal case, the warrantless seizure of certain evidence was justified
under the plain view doctrine and a defendant's motion to suppress the
evidence was correctly denied. [614-615]

[1]Commonwealth vs. Alfred Carvalho.

INDICTMENTS found and returned in the Superior Court Department on January 28, 1985.

Pretrial motions to suppress evidence and to dismiss on the ground that the integrity of the grand jury proceedings was impaired were heard by *George Jacobs*, J. A motion to dismiss under rule 36 of the Massachusetts Rules of Criminal Procedure was heard by *Chris Byron*, J. The cases were heard by *Cortland A. Mathers*, J.

*John Silvia, Jr.*, for Alfred Carvalho.

*Daniel L. Viveiros* for Ronald G. Anselmo.

*Elspeth B. Cypher*, Assistant District Attorney, for the Commonwealth.

FINE, J. After a jury-waived trial, a judge of the Superior Court found the defendants, Ronald G. Anselmo and Alfred Carvalho, guilty of conspiracy to commit larceny of property worth over one hundred dollars (see G. L. c. 274, § 7). Anselmo, a Fall River police officer, owned J & R Liquors, a retail liquor store in Fall River. Carvalho, Anselmo's cousin, worked as a truck driver for J.J. Taylor Distributing Co., Inc. (J.J. Taylor, Inc.), a wholesale distributor of beer and wine in southeastern Massachusetts. The case involved an alleged arrangement among the two defendants and others to steal beer from J.J. Taylor, Inc., to be sold at J & R Liquors.

The defendants raise numerous issues on appeal from their convictions and the denial of their motions for new trial. We discuss in some detail only the significant issues: both defendants' contentions that the evidence was insufficient to justify the findings of guilt beyond a reasonable doubt; both defendants' contentions that they were unfairly prejudiced by the trial judge's actions with respect to prior inconsistent statements of two Commonwealth witnesses; and Anselmo's contention that he was denied his right to a speedy trial. We dispose of the defendants' remaining contentions without extended discussion. Finding no merit in any of the arguments made on appeal, we affirm.

1. *The sufficiency of the evidence.* Both defendants argue that the judge should have allowed their motions for required findings of not guilty, filed both at the close of the Common-

wealth's case and at the close of all the evidence. The issue is whether, on the evidence viewed in the light most favorable to the Commonwealth, the trier of fact "might properly [have] draw[n] inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and [have] conclude[d] upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt." *Commonwealth v. Clary*, 388 Mass. 583, 588 (1983), quoting from *Commonwealth v. Vellucci*, 284 Mass. 443, 445 (1933). A finding may be warranted "even though the inference of guilt from the facts established is not inescapable or necessary." *Commonwealth v. Gagnon*, 408 Mass. 185, 200-201 (1990).

A conspiracy is a "combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Commonwealth v. Beneficial Fin. Co.*, 360 Mass. 188, 249 (1971), cert. denied, 407 U.S. 914 (1972), quoting from *Commonwealth v. Hunt*, 4 Met. 111, 123 (1843). A conspiracy need not be proved, however, by direct evidence of participation or by an admission of participation. See *Commonwealth v. Nelson*, 370 Mass. 192, 200 (1976). "A conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed toward the accomplishment of the same object, especially if by the same means or in the same manner, may be satisfactory proof of a conspiracy." *Id.* at 200-201, quoting from *Commonwealth v. Smith*, 163 Mass. 411, 417-418 (1895). "Circumstances must be shown from which a reasonable inference can be drawn that the defendant participated in the particular conspiracy charged." *Commonwealth v. Nelson, supra* at 201, quoting from *Commonwealth v. Schnackenberg*, 356 Mass. 65, 74 (1969).

a. *Evidence against Anselmo.* The evidence, viewed in the light most favorable to the Commonwealth, was sufficient to permit a finding that Anselmo was engaged in a conspiracy with others to commit larceny of beer, worth more than one hundred dollars, from J.J. Taylor, Inc. There was evidence that either Anselmo or Sharon Gary, the manager of J & R Liquors, rented a truck on eleven separate occasions between September of 1982 and August of 1983 and that each such occasion corresponded with a day in which Carvalho was paired with the same individual, John Silvia, to deliver beer by truck on behalf of J.J. Taylor, Inc.[2] Carvalho and Silvia had a period of "free time" on each of those occasions that corresponded to the time of day during which Anselmo or Sharon Gary rented the truck, and the mileage for the rental truck was, in most instances, consistent with trips to the areas in which Carvalho and Silvia were scheduled to deliver beer.

There was further evidence that on September 7, 1983, 182 cases of "unaccounted-for" beer were found at J & R Liquors, that the markings on the cans indicated that the beer was from the record inventory of J.J. Taylor, Inc., and that J & R Liquors had no business records to support the claim that the beer had been purchased from J.J. Taylor, Inc., the only beer distributor with whom J & R Liquors dealt. When confronted by a State police officer, Anselmo claimed that he had purchased the beer as loose cans and had made his own six-packs with used plastic holders. The numbers on the cans comprising each six-pack were identical, however, and these numbers matched those on the boxes holding the beer, a highly unlikely coincidence if the six-packs had, in fact, been arranged by Anselmo. Anselmo also

---

[2]Carvalho was not routinely paired with Silvia, suggesting that the pairing of the two men on each of the eleven occasions when either Anselmo or Sharon Gary rented a truck was more than mere coincidence. However, there also were days on which Carvalho and Silvia worked together when no trucks were rented by either Anselmo or Sharon Gary, as well as days on which there were truck rental agreements but Carvalho and Silvia were not paired together. In addition, on each of the eleven dates in question, there were other pairs of drivers who often worked together.

offered to pay J.J. Taylor, Inc., for the beer in order to prevent its confiscation. Anselmo's statements were indicative of consciousness of guilt. See *Commonwealth* v. *Doucette*, 408 Mass. 454, 461 (1990).

The prosecutor also presented evidence through Sharon Gary's estranged husband, William Gary, who worked for J & R Liquors during 1982, that he had overheard Sharon Gary tell Anselmo, "We owe Al [Carvalho] $1,800," and on another occasion that they owed Carvalho $1,200. On yet another occasion, a day or two following a beer delivery by a rental truck at J & R Liquors, William Gary saw Sharon Gary hand Carvalho a white envelope. William Gary also testified that during May or June, 1982, he had asked Anselmo, "Why are we buying so much hot beer?" to which Anselmo replied, "At six bucks a case plus no deposit[s], I can't afford not to,"[3] and that during this same time period he had overheard Sharon Gary and Anselmo discussing the necessity of storing a particular beer shipment that had arrived in a rental truck in a part of the store where one of the employees would not see it.

There was additional evidence against Anselmo offered through the testimony of Gabriel P. Sousa, an employee of J & R Liquors during 1982. On November 26, 1982, Sousa assisted Anselmo in picking up beer from a location in New Bedford. Anselmo rented a truck, and he and Sousa drove to a specific intersection in New Bedford where they met a second truck. The trucks then proceeded to a nearby parking lot where fifty to one hundred cases of beer were removed from the second truck and loaded onto Anselmo's rented truck. The cases of beer were then transported to J & R Liquors in New Bedford. The date of this incident corresponded with a date when records show that Anselmo rented a truck in Fall River; it was also a date on which Carvalho and Silvia were

---

[3]The reference to "deposit[s]" is curious as "the bottle bill" (G. L. c. 94, § 321) first took effect on January 17, 1983, and the statement was allegedly made in 1982. Before that statute took effect, "deposit[s]" or returns were not required. The inconsistency in William Gary's testimony did not destroy its probative value; instead, it raised a question of credibility for the trier of fact. See *Commonwealth* v. *Clary*, 388 Mass. at 589.

paired on a truck scheduled to make deliveries of beer in the New Bedford area; and the mileage on the rental truck was consistent with the mileage for travel between Fall River and New Bedford.

An inference of Anselmo's guilt based on all the evidence may not have been inescapable.[4] The trier of fact could reasonably have concluded, however, that a conspiracy existed among Anselmo and others to commit larceny. Specifically, the evidence provided a basis for a reasonable inference that on certain days when Carvalho was paired with Silvia, Carvalho would load extra beer for delivery to Anselmo, that Anselmo or Sharon Gary would rent a truck and meet Carvalho at a designated location, that the beer would be transferred, and that Anselmo would pay Carvalho at a later date.

b. *Evidence against Carvalho.* The evidence against Carvalho, while altogether circumstantial and not as strong as the evidence against Anselmo, was adequate to justify his conviction. His participation in the conspiracy may be inferred from the numerous trip tickets that pair him with Silvia on the same dates on which Anselmo or Sharon Gary rented a truck, the free time during Carvalho's and Silvia's delivery schedules that corresponded to the periods of time during which the trucks were rented, the mileage on the rental trucks which was consistent with their use for the purpose of collecting the stolen beer, and the testimony of William Gary that Sharon Gary said Anselmo owed money to Carvalho.[5] In addition, Anselmo and Carvalho were cousins.

To be sure, there were gaps in the evidence. Neither Sousa nor anyone else could say that Carvalho was the driver of the delivery truck that met Anselmo's rental truck on November 26, 1982, or that either Carvalho *or* Silvia unloaded cases of

---

[4] To be sure, there was some contrary evidence. For example, there was no evidence that J.J. Taylor, Inc., was aware of any thefts of beer in 1982, and the truck driven by Carvalho on November 26, 1982, did not fit the description of the trucks given by Sousa and may not have had room on it for any beer that was not scheduled for lawful delivery.

[5] Carvalho testified before the grand jury that Anselmo never owed him money.

beer from one truck to another on that date.[6] Nevertheless, we think the judge could infer that the unusual number of suspicious circumstances related to the trip tickets and truck rentals was more than mere coincidence. We conclude that the evidence was sufficient to permit a rational trier of fact to find that Carvalho knew of the existence and objective of the conspiracy and that he participated in it. See *Commonwealth v. Burke*, 20 Mass. App. Ct. 489, 505-506 (1985).

2. *Exposure of the trial judge to prejudicial recanted statements of two Commonwealth witnesses.* The defendants based their motions for mistrial and new trial on the claims that the trial judge improperly considered prejudicial and inflammatory evidence from two of the Commonwealth's own witnesses which was inadmissible because of the prosecutor's failure to comply with the requirements of G. L. c. 233, § 23.[7] The witnesses, Joyce and Edward Cowen, husband and wife, had made prior statements in writing to the police inculpating Anselmo. Joyce Cowen had stated, among other things, that she had observed a "U-Haul" truck containing beer being unloaded by Anselmo and others at J & R Liquors about two weeks before the police first found stolen beer in the store. At trial, however, both witnesses recanted their earlier statements, claiming that they had not seen any "U-Haul" truck being unloaded and that they had lied to the police.

Over the objections of defense counsel, the judge read Joyce Cowen's statement to determine whether to admit it. The judge also allowed the prosecutor, over objection, to question the Cowens about their earlier statements, and he refused to strike the testimony of the Cowens. The judge ulti-

---

[6]Sousa testified that it was dark, and that, of the two men, he "never pictured their faces."

[7]General Laws c. 233, § 23, provides:

"The party who produces a witness . . . may . . . prove that he has made at other times statements inconsistent with his present testimony; but before proof of such inconsistent statements is given, the circumstances thereof sufficient to designate the particular occasion shall be mentioned to the witness, and he shall be asked if he has made such statements, and, if so, shall be allowed to explain them."

mately excluded the prior written statements themselves from evidence.

The questioning of both witnesses by the prosecutor about their prior inconsistent statements, and the refusal of the judge to strike the testimony of Joyce and Edward Cowen, were proper because the witnesses could reasonably have been found to be hostile. See *Commonwealth* v. *LaFrance*, 361 Mass. 53, 57 (1972). Further, Joyce Cowen acknowledged at trial that during November, 1987, she had given her statement to officers of the Somerset police department while they were investigating a fire that had destroyed her house. By making Joyce Cowen generally aware of the time, place and content of the prior statement and by giving her an opportunity to explain it, the prosecutor clearly laid a proper foundation as required by G. L. c. 233, § 23. The judge was not required, therefore, to exclude her statement. He could properly have considered it for impeachment purposes. See *Commonwealth* v. *Cappellano*, 17 Mass. App. Ct. 272, 278-279 (1983). Even if a statement is inadmissible, it is not necessarily error for a judge who is the fact finder to examine it. In any event, we would not lightly assume that the judge, sitting without a jury, improperly considered Joyce Cowen's statement for its truth. There was no unfair prejudice, therefore, merely as a result of the judge having read the statement.

The defendants moved for a mistrial, and later for a new trial, contending that the judge's remarks during trial showed a predisposition against the defendants caused by his having considered, improperly, the Cowens' prior statements. During a lobby conference conducted during the examination of Joyce Cowen, the judge stated to counsel his belief that

the witness was committing perjury.[8] The judge repeated this sentiment in regard to Edward Cowen.[9]

Although, perhaps, the trial judge should not have commented on the credibility of the two witnesses and, implicitly, the defendants' guilt, before all the evidence in the case had been presented to him, we would not assume that he reached his findings of guilty on other than a fair appraisal of all the evidence. At the hearing on the defendants' motion for a new trial, the judge elaborated on his reasoning and his appraisal of the evidence before reaching his findings in the case. He indicated that, notwithstanding some earlier uncertainty, it was his "very extensive and careful examination of the trip tickets of the trucks, the time lapses, the mileage which . . . wove an inextricable net around [both defendants.] So that it doesn't remain any mystery to either of the counsel for the defendants, that was the conclusive proof, in my judgment, that caused me to find them guilty." In light of the judge's comments, and the deference we generally accord trial judges' rulings on motions for new trial, see *Commonwealth v. Grace*, 397 Mass. 303, 307 (1986), we do not think the judge abused his discretion or made an error of law in concluding that considerations of justice and fairness did not require that the defendants have a new trial.

3. *Anselmo's contention that he was denied a speedy trial.* Indictments were handed up against Anselmo and Carvalho on January 28, 1985, and they were arraigned and entered pleas of not guilty on February 6, 1985, and February 11, 1985, respectively. On May 20, 1987, Anselmo filed a motion to dismiss the indictment against him on the ground that he had not been brought to trial within twelve months of his arraignment as required by Mass.R.Crim.P. 36(b)(1), 378 Mass. 909 (1979). A judge of the Superior Court issued find-

---

[8]During this lobby conference, the judge stated to the prosecutor, "I'm going to say this, apart from her name, that woman has hardly breathed a word of truth since she got on that witness stand. And I am not going to have much alternative but to hold her for perjury."

[9]On one occasion the judge stated in open court, "This man is absolutely incapable of speaking the truth." Later on the same day, the judge had Edward Cowen held for perjury.

ings of fact and rulings of law and denied the motion on May 18, 1988. On March 9, 1989, Anselmo and Carvalho filed waivers of trial by jury. After a voir dire, a judge of the Superior Court accepted the defendant's waivers. The jury-waived trial commenced on March 10, 1989, more than four years after arraignment.

When defendants are not brought to trial within one year of the return day, the date of arraignment, they are presumptively entitled to have the charges against them dismissed under rule 36 unless it is shown that the delay is justified by time periods specifically excludable under rule 36 or by other sufficient reason. See *Barry* v. *Commonwealth*, 390 Mass. 285, 291-294 (1983). The Commonwealth, defense counsel, and the court are obligated to work diligently toward the goal of providing speedy trials in criminal cases. See *id.* at 296; *Commonwealth* v. *Lauria*, 411 Mass. 63, 68 (1991).

Anselmo and the Commonwealth agree as to certain periods that elapsed between the return day and trial that are excludable and other periods that are not. On appeal, Anselmo discusses four particular periods as to which there is a dispute. The parties agree that the Commonwealth need justify only fifty-one days during any of the disputed periods to prevail on appeal on the speedy trial claim.[10] Since all four of the disputed periods exceed that number of days, as long as the Commonwealth establishes that *one* of the disputed periods was excludable, the denial of Anselmo's motion to dismiss was proper. In our view, the Commonwealth has made the required showing with respect to more than fifty-one days during the disputed period between June 17, 1987, and November 6, 1987.

---

[10]On its face, the twelve-month limit was exceeded by 1,128 days. The defendants, however, have conceded 387 days from the date of arraignment on February 6, 1985, through February 28, 1986. The defendants also do not challenge the 468 days after November 6, 1987. After subtracting these periods, 273 days remain that the Commonwealth must justify. After deducting the excludable noncontested periods from February 28, 1986, to November 6, 1987, fifty-one days remain that the Commonwealth must justify.

According to the docket entries, the defendant filed his motion to dismiss on speedy trial grounds on May 20, 1987, and on May 27, 1987, the parties appeared in court and agreed to the following schedule: the defendant's memorandum of law on the motion to dismiss to be filed on June 10, 1987; the Commonwealth's reply memorandum on the motion to be filed on June 17, 1987; trial to commence on June 29, 1987, should the motion to dismiss be denied. The defendant's memorandum in support of his motion to dismiss was filed on June 10, 1987. The Commonwealth did not file its reply memorandum on June 17, 1987. Trial did not commence, and none of the parties appeared in court on June 29, 1987. No further action was taken in the case until November 6, 1987, the date on which the Commonwealth finally filed a memorandum and affidavit in opposition to the defendant's motion to dismiss. The parties agree that the period after November 6, 1987, should be excluded for purposes of rule 36.

Generally, the filing of a motion to dismiss, at least if a hearing on the motion promptly follows, tolls the running of the time in which a defendant must be tried for purposes of rule 36. See *Barry* v. *Commonwealth*, 390 Mass. at 294. A hearing did not promptly follow the filing of the motion to dismiss in this case. The issue turns, therefore, on the extent to which Anselmo may be held accountable for the delay.

Anselmo took no action between the filing of his memorandum on June 10, 1987, and the date, five months later, when the Commonwealth filed its reply memorandum. The Commonwealth bore the primary burden of moving the case along. Having missed the filing date for its memorandum and then having remained inactive for five months, the Commonwealth certainly bore a significant portion of the responsibility for the delay. Anselmo must be deemed to have shared that responsibility, however. See *Commonwealth* v. *Lauria*, 411 Mass. at 69. At least by June 29, 1987, the date conditionally set for trial, Anselmo should have begun to inquire as to the status of the motion to dismiss. The motion was ripe for decision at that time even in the absence of a Common-

wealth memorandum. Having failed to press for the motion to be resolved, Anselmo must be deemed to have acquiesced in the delay.[11] The period at least from June 29, 1987, to November 6, 1987, therefore, is excluded. That period exceeds the fifty-one days the Commonwealth must justify.

4. *Other issues.*

a. *Admissibility of a hearsay statement.* Carvalho challenges the admission of Sharon Gary's out-of-court statement to Anselmo that "[w]e owe Al [Carvalho] $1,800." An admission or declaration which, according to evidence, is made during the furtherance of a conspiracy by a coconspirator is admissible as an exception to the hearsay rule. See *Commonwealth* v. *Galvin*, 310 Mass. 733, 746 (1942); *Commonwealth* v. *French*, 357 Mass. 356, 381-382 (1970). There was ample evidence at trial of Sharon Gary's participation in the alleged conspiracy. Carvalho claims the statement does not fall within the hearsay exception because Sharon Gary had been found not guilty of the crime of larceny after a separate trial. As it would have been possible for Sharon Gary to be a coconspirator without actually having committed larceny, see *Commonwealth* v. *Stasiun*, 349 Mass. 38, 47-48 (1965), the acquittal of larceny is irrelevant for the purpose of the statement's admissibility. Even acquittal of conspiracy after a separate trial would not have rendered the statement inadmissible. Compare *Commonwealth* v. *Cerveny*, 387 Mass. 280, 285 (1982); *Commonwealth* v. *Jones*, 403 Mass. 279, 290 (1988).

b. *Integrity of the grand jury proceedings.* Anselmo moved to dismiss the indictment against him, contending that the grand jury proceedings were conducted with such irregularity that their integrity was fatally impaired. On October 14, 1983, a grand jury heard testimony from a number of witnesses, including Anselmo, Carvalho, Sousa, and Sharon Gary, but no indictments were returned. On January 18,

[11]Although the cases do not require the Commonwealth to show that a defendant benefited from delay for a time period to be excluded, we note that the Cowens decided to recant their prior incriminatory statements just prior to testifying at trial.

1985, a second grand jury, which did indict Anselmo, heard testimony from Carvalho, William Gary, and a State trooper; who offered a summary of the evidence presented to the first grand jury. The State trooper did not tell the second grand jury, however, that William Gary had disavowed knowledge of any missing or stolen beer before the first grand jury. Anselmo also claimed that the introduction at the second grand jury of a letter of intention not to prosecute William Gary from the district attorney enhanced Gary's credibility to such an extent as to further harm the integrity of the proceedings.

Denial of the motion to dismiss the indictments was not error. Even assuming William Gary's earlier denial of knowledge of missing or stolen beer constituted exculpatory evidence, disclosure to the grand jury was not necessarily required. Only when the prosecutor "possesses evidence which would greatly undermine the credibility of evidence likely to affect the grand jury's decision to indict, [must he] alert the grand jury to the existence of such evidence." See *Commonwealth* v. *McGahee*, 393 Mass. 743, 746 (1985). Contrast *Commonwealth* v. *O'Dell*, 392 Mass. 445, 447 (1984). We do not think either the omission here or the reference rose to that level. Nor has Anselmo shown that any evidence, in particular, the prosecutor's letter to William Gary, was placed before the grand jury with either knowledge that it was false or deceptive or a reckless disregard for the truth, or that the presentation of such evidence influenced the grand jury's determination to hand up an indictment. See *Commonwealth* v. *Mayfield*, 398 Mass. 615, 621-622 (1986).

c. *The warrantless seizure*. The seizure of beer from Anselmo's liquor store on September 7, 1983, by members of the State police and an investigator from the Alcoholic Beverages Control Commission was not a violation of either the Fourth Amendment to the United States Constitution or art. 14 of the Massachusetts Declaration of Rights. When reviewing a denial of a motion to suppress, the motion judge's findings are accepted unless found to be clearly erroneous. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743

(1990). The motion judge found that the officers who seized the beer were lawfully on the commercial premises, the beer was clearly visible, and that they had reason to believe it was stolen. The warrantless seizure of the beer, therefore, was justified under the plain view doctrine. See *Commonwealth* v. *Accaputo*, 380 Mass. 435, 447 (1980).

*Judgments affirmed.*